

1   Rosemary M. Rivas (State Bar No. 209147)
    rrivas@finkelsteinthompson.com
2   Mark Punzalan (State Bar No. 247599)
    mpunzalan@finkelsteinthompson.com
3   FINKELSTEIN THOMPSON LLP
    100 Bush Street, Suite 1450
4   San Francisco, California 94104
5   Telephone: (415) 398-8700
    Facsimile: (415) 398-8704
6
7
8   [Additional Counsel Listed on Signature Page]

9   Counsel for Plaintiff Michael Silbergleid

10              UNITED STATES DISTRICT COURT

11              CENTRAL DISTRICT OF CALIFORNIA

12

13  MICHAEL SILBERGLEID, on behalf          Case No. CV09-9495 GHK PJWx
    of himself and all others similarly
14  situated,
                                            COMPLAINT FOR VIOLATION
15                  Plaintiff,              OF THE FEDERAL SECURITIES
                                            LAWS
16
17          v.
                                            JURY TRIAL DEMANDED
18  RENTECH, INC.; D. HUNT
    RAMSBOTTOM; MERRICK KERR;
19  DOUGLAS M. MILLER; DAN J.
    COHRS; DENNIS L. YAKOBSON;
20  MICHAEL S. BURKE; MICHAEL F.
    RAY; EDWARD M. STERN;
21  RONALD M. SEGA; HALBERT S.
22  WASHBURN; RICHARD T.
    PENNING
23
24
                    Defendants.
25

26
        Plaintiff Michael Silbergleid ("Plaintiff"), by his undersigned attorneys,
27
28  alleges the following based upon personal knowledge as to his own acts, and

                                    1
                        CLASS ACTION COMPLAINT

information and belief as to all other matters, based upon, among other things, the

investigation conducted by and through his attorneys, which included, among other

things, a review of the public documents and announcements made by the

Defendants, Securities and Exchange Commission ("SEC") filings, press releases,

news articles, and analyst reports regarding Rentech, Inc. ("Rentech" or the

"Company"). Plaintiff believes that substantial evidentiary support will exist for

the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF ACTION

1.      This is a securities class action brought on behalf of all persons who

purchased the publicly traded securities of Rentech, Inc. during the period between

February 8, 2008 to December 15, 2009, inclusive (the "Class Period") against

Rentech and certain of its officers and directors for violations of the Securities

Exchange Act of 1934 ("Exchange Act").

2.      Defendant Rentech markets itself as a provider of "clean energy

solutions" and develops projects that produce synthetic fuels and electric power

from carbon-containing materials such as biomass, waste and fossil resources.

3.      During the Class Period, Defendants issued materially false and

misleading statements regarding the Company's financial results and compliance

with Generally Accepted Accounting Principles ("GAAP"). Specifically, during

the Class Period, the Company improperly reported certain deposit payments

CLASS ACTION COMPLAINT

associated with natural gas purchase contracts as inventory, which resulted in artificially inflated prices during the Class Period for Rentech shares.

4.    On December 14, 2009 and December 15, 2009, Rentech revealed that the Company would have to restate previously issued financial statements from 2008 and 2009 due to accounting errors related to the treatment of forward gas purchase contracts and inventory valuation.

5.    As a result of Defendants' false statements and omissions, Rentech stock traded at artificially inflated prices during the Class Period.  After the Company revealed its accounting issues to the market, Rentech shares plunged to a low of $1.27 a share on December 18, 2009, representing a 25% drop from the stock's opening price on December 14, 2009 and a 46% drop from the stock's high trading price during the Class Period.

## JURISDICTION AND VENUE

6.    This action arises under Section 10(b) and 20(a) of the Exchange Act of 1934, as amended, 15 U.S.C. §§ 78j(b), 78(n) and 78t(a), and Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder.  This Court has jurisdiction over this subject matter pursuant to 28 U.S.C. §§ 1331, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

7.    Venue is proper in this district pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b) because substantial acts in furtherance of the alleged fraud or the effect of the fraud occurred in this District.  In addition, many of the

CLASS ACTION COMPLAINT

acts and practices made in furtherance of Defendants' scheme and complained of herein occurred in substantial part and/or had an effect in this District. Further, Defendants were, during the Class Period, located in, or conducted substantial business within this District.

8.    In connection with the acts alleged in this complaint, the Defendants, directly or indirectly, used means and instrumentalities of interstate commerce, including but not limited to the mails, interstate telephone and Internet communications.

## PARTIES

9.    Plaintiff purchased shares of Rentech during the Class Period at artificially inflated prices and was damaged thereby, as reflected in the certification filed herewith.

10.    Defendant Rentech is a Colorado corporation with its principal executive offices located at 10877 Wilshire Boulevard, Suite 710, Los Angeles, California 90024.

11.    Defendant D. Hunt Ramsbottom has been the Chief Executive Officer, President and a Director of Rentech at all relevant times.

12.    Defendant Merrick Kerr was the Chief Executive Officer Executive Vice President and Chief Financial Officer of Rentech until his resignation in July 18, 2008.

CLASS ACTION COMPLAINT

13.    Defendant Douglas M. Miller has been the Executive Vice President for Renewable Energy Businesses for Rentech since January 2009.

14.    Defendant Dan J. Cohrs has been the Chief Financial Officer and Executive Vice President of Rentech since October 2008.

15.    Defendant Dennis L. Yakobson has served as a Director of Rentech and Chairman of the Board at all relevant times.  Yakobson is one of the Company's founders.

16.    Defendant Michael S. Burke has served as a Director of Rentech at all relevant times.

17.    Defendant Michael F. Ray has served as a Director of Rentech at all relevant times.

18.    Defendant Edward M. Stern has served as a Director of Rentech at all relevant times.

19.    Defendant Ronald M. Sega has served as a Director of Rentech at all relevant times.

20.    Defendant Halbert S. Washburn has served as a Director of Rentech at all relevant times.

21.    Defendant Richard T. Penning has served as the Executive Vice President of Technology and Commercial Affairs for Rentech at all relevant times.

22.    The Defendants referenced in ¶¶ 11-21 are referred to herein as the "Individual Defendants."  The Individual Defendants, because of their positions

with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## SUBSTANTIVE ALLEGATIONS

### BACKGROUND

23.     Defendant Rentech is a provider of "clean energy solutions" and developer of projects that produce synthetic fuels and electric power from carbon-containing materials such as biomass, waste and fossil resources.

//

//

1  **DEFENDANTS' MATERIALLY FALSE AND MISLEADING**
2  **STATEMENTS ISSUED DURING THE CLASS PERIOD**

3      24.     On February 8, 2008, Rentech issued a press release announcing its

4  results for its fiscal 2008 first quarter ended December 31, 2007.  The press release

5

6  stated, in relevant part:

7      Rentech reported revenue of $47.5 million for the first quarter of fiscal 2008,
       compared to $35.4 million for the comparative quarter in fiscal 2007.
8      Rentech reported a net loss applicable to common shareholders of $23.4
9      million or ($0.14) per share for the quarter ended December 31, 2007,
       compared to a net loss applicable to common shareholders of $8.7 million or
10     ($0.06) per share for the quarter ended December 31, 2006. The increase in
11     revenue during the quarter was due to strong demand and a substantial
       increase in market prices for Rentech Energy Midwest Corporation's
12     ("REMC") fertilizer products.

13     Selling, general and administrative ("SG&A") expenses were $8.8 million
14     for the fiscal quarter ended December 31, 2007, compared to $6.7 million
15     for the comparable period in fiscal 2007. The change in SG&A expenses
       was primarily due to costs associated with increased personnel and
16     information technology enhancements. Research and development ("R&D")
17     expenses for the fiscal quarter ended December 31, 2007 were $16.0 million
       as compared to $8.4 million for the comparable period in fiscal 2007. Much
18     of the R&D increase was attributable to expenses incurred for the design of,
19     procurement of equipment for and construction of the Company's Product
       Demonstration Unit, a fully integrated synthetic fuels demonstration facility
20     in Commerce City, Colorado. Also included in the increase for the current
21     period were expenses incurred for work on advanced catalysts, catalyst
       separation from crude wax, process optimization and product upgrading.
22     Operating expenses for the quarter included an impairment charge of $8.7
23     million or ($0.05) per share impact arising from the deferral of the REMC
       conversion project.
24

25     As of December 31, 2007, Rentech had cash and cash equivalents and
       marketable securities of $57.8 million.
26

27     Commenting on the financial results for the first quarter of fiscal 2008, D.
       Hunt Ramsbottom, President and CEO of Rentech stated, "We are pleased
28     with the continued strong performance of REMC. We expect pricing and

7

demand for REMC products to remain strong for the remainder of the fiscal year." Mr. Ramsbottom continued, "REMC continues to provide significant cash flows to support Rentech's synthetic fuels commercialization efforts."

Results from continuing operations for the first quarter of fiscal 2007 exclude those of Petroleum Mud Logging, LLC ("PML"). Rentech sold PML on November 15, 2006 and thus classified it as a discontinued operation for the period.

25.    On the same day, Rentech filed a Form 10Q with the SEC for fiscal 2008 first quarter ended December 31, 2007. This Form 10-Q was signed by Defendants Ramsbottom  and Kerr reaffirmed the Company's financial results announced on the same day.

26.    On May 9, 2008, Rentech issued a press release announcing its results for its fiscal 2008 second quarter ended March 31, 2008. The press release stated, in relevant part:

Rentech reported revenue of $28.5 million for the second quarter of fiscal 2008, compared to $16.9 million for the comparative quarter in fiscal 2007. Rentech reported a net loss applicable to common shareholders of $22.8 million or ($0.14) per share for the quarter ended March 31, 2008, compared to a net loss applicable to common shareholders of $17.2 million or ($0.12) per share for the quarter ended March 31, 2007. The increase in revenue during the quarter was the result of strong demand and pricing for nitrogen fertilizer products produced at Rentech Energy Midwest Corporation ("REMC").

Selling, general and administrative ("SG&A") expenses were $9.0 million for the fiscal quarter ended March 31, 2008, compared to $6.9 million for the comparable period in fiscal 2007. The change in SG&A expenses was primarily due to costs associated with increased personnel, information technology enhancements and professional fees. Research and development ("R&D") expenses for the fiscal quarter ended March 31, 2008 were $22.1 million as compared to $11.0 million for the comparable period in fiscal

2007. Much of the R&D increase was attributable to expenses incurred for the design of, procurement of equipment for and construction of the Company's Product Demonstration Unit ("PDU"), a fully integrated synthetic fuels plant in Commerce City, Colorado. Also included in the increase for the current period were expenses incurred for work on advanced catalysts, catalyst separation from crude wax, process optimization and product upgrading.

For the six months ended March 31, 2008, Rentech reported revenue of $76.0 million compared to $52.3 million for the comparative period in fiscal 2007. Rentech recorded a net loss applicable to common stockholders of $46.2 million or ($0.28) per share for the six months ended March 31, 2008, compared to a net loss applicable to common stockholders of $25.9 million or ($0.18) per share for the comparative period in fiscal 2007.

SG&A expenses were $17.8 million for the six months ended March 31, 2008, compared to $13.6 million for the comparable period in fiscal 2007. R&D expenses for the six months ended March 31, 2008 were $38.1 million as compared to $19.4 million for the comparable period in fiscal 2007, primarily due to expenses related to the PDU. Operating expenses for the fiscal year 2008 included an impairment charge of $9.1 million or ($0.06) per share impact arising from the winding down of the REMC conversion project.

As of March 31, 2008, Rentech had cash and cash equivalents of $23.3 million and available for sale securities of $8.3 million.

Commenting on the financial results for the second quarter of fiscal 2008, D. Hunt Ramsbottom, President and CEO of Rentech stated, "REMC continues to perform well, driven by strong demand for biofuels. As a result, we are evaluating opportunities to increase the efficiency of the facility. In addition, we are currently engaged in a company-wide cost review and reduction program that will take corporate spending to a level that can be supported by the free cash flow at REMC."

27.    On the same day, Rentech filed a Form 10Q with the SEC for for its fiscal 2008 second quarter ended March 31, 2008. This Form 10Q was signed by

9

CLASS ACTION COMPLAINT

Defendants Ramsbottom and Kerr and reaffirmed the Company's financial results announced that same day.

28.    On August 11, 2008, Rentech issued a press release announcing its results for its fiscal 2008 third quarter ended June 30, 2008. The press release stated, in relevant part:

> Rentech reported revenue of $60.4 million for the third quarter of fiscal 2008, compared to $50.4 million for the comparative quarter in fiscal 2007. Rentech reported a net loss applicable to common shareholders of $7.8 million or ($0.05) per share for the quarter ended June 30, 2008, compared to a net loss applicable to common shareholders of $6.9 million or ($0.04) per share for the quarter ended June 30, 2007. The increase in revenue during the quarter was the result of strong demand and pricing for nitrogen fertilizer products produced at the Company's wholly-owned subsidiary, Rentech Energy Midwest Corporation ("REMC").
>
> The Company is raising its guidance for fiscal year 2008 EBITDA at REMC to $50 million or greater from its previous projection of over $40 million. In addition, the Company is projecting fiscal year 2009 EBITDA at REMC to exceed fiscal 2008 levels.
>
> Selling, general and administrative ("SG&A") expenses were $8.3 million for the fiscal quarter ended June 30, 2008, compared to $8.2 million for the comparable period in fiscal 2007. The change in SG&A expenses was primarily due to costs associated with increased personnel and consulting and professional fees. Research and development ("R&D") expenses for the fiscal quarter ended June 30, 2008 were $15.8 million as compared to $7.8 million for the comparable period in fiscal 2007. Much of the R&D increase was attributable to expenses incurred for the design of, procurement of equipment for and construction of the Company's Product Demonstration Unit ("PDU"), a fully integrated synthetic fuels plant in Commerce City, Colorado. Construction of the PDU was completed in the quarter and these expenses are not expected to be incurred going forward. Also included in the increase for the current period R&D expenses were costs incurred for work on advanced catalysts, catalyst separation from crude wax, process optimization and product upgrading.

For the nine months ended June 30, 2008, Rentech reported revenue of $136.4 million compared to $102.7 million for the comparative period in fiscal 2007. Rentech recorded a net loss applicable to common stockholders of $54.0 million or ($0.33) per share for the nine months ended June 30, 2008, compared to a net loss applicable to common stockholders of $32.8 million or ($0.22) per share for the comparative period in fiscal 2007.

SG&A expenses were $26.1 million for the nine months ended June 30, 2008, compared to $21.8 million for the comparable period in fiscal 2007. R&D expenses for the nine months ended June 30, 2008 were $53.9 million as compared to $27.2 million for the comparable period in fiscal 2007, primarily due to expenses related to the PDU. Operating expenses for the fiscal year 2008 included an impairment charge of $9.3 million or ($0.06) per share impact arising from the winding down of the REMC conversion project.

Commenting on the financial results for the third quarter of fiscal 2008, D. Hunt Ramsbottom, President and CEO of Rentech stated, "We are pleased with the continued robust performance at REMC, which has exceeded our expectations. In fiscal 2009 we expect increased EBITDA performance at REMC and reductions in spending now that construction of our Product Demonstration Unit is complete. We also expect corporate overhead reductions as a result of our company-wide cost review program."

29.    On the same day, Rentech filed a Form 10Q with the SEC for its fiscal 2008 third quarter ended June 30, 2008. This Form 10Q was signed by Defendants Ramsbottom and Miller and reaffirmed the Company's financial results announced on the same day.

30.    On December 15, 2008, Rentech issued a press release announcing its results for its fiscal 2008 fourth quarter and fiscal year ended September 30, 2008.. The press release stated, in relevant part:

For the fourth quarter of fiscal year 2008, Rentech reported revenue of $74.6 million, compared to $29.6 million for the comparable quarter in the prior year. Rentech reported a net loss applicable to common shareholders of $8.9

11

million or $0.05 per share for the quarter ended September 30, 2008, which included $0.02 per share of non-cash impairment charges. This compares to a net loss applicable to common shareholders of $58.9 million or $0.36 per share for the comparable period in fiscal year 2007, which included $0.23 per share of non-cash impairment charges.

Rentech is currently projecting consolidated EBITDA to be positive in fiscal year 2009. This is a result of the Company's continued confidence based on current market conditions that EBITDA at the Company's wholly-owned fertilizer facility, Rentech Energy Midwest Corporation (REMC), will be well in excess of $50 million in fiscal year 2009. The Company's projected consolidated EBITDA also takes into consideration the cost saving steps it has implemented at the corporate level and at its Product Demonstration Unit (PDU) in Colorado, as well as the fact that construction of the PDU has been completed. EBITDA is a non-GAAP measure. Further explanation of this non-GAAP measure and a computation of REMC's EBITDA has been included below in this press release.

For the fiscal year ended September 30, 2008, Rentech reported revenue of $211.0 million compared to $132.3 million for the prior fiscal year. Rentech reported a net loss applicable to common shareholders of $62.9 million or $0.38 per share for the fiscal year ended September 30, 2008, which included $0.08 per share of non-cash impairment charges. This compares to a net loss applicable to common shareholders of $91.7 million or $0.61 per share for the comparable period in fiscal year 2007, which included $0.26 per share of non-cash impairment charges.

Selling, general and administrative expenses were $33.4 million for the fiscal year ended September 30, 2008, compared to $28.1 million for the prior year. Research and development ("R&D") expenses for the fiscal year ended September 30, 2008 were $64.5 million as compared to $43.1 million in fiscal year 2007. Much of the R&D increase was attributable to expenses incurred for the design and procurement of equipment for and construction of the Company's Product Demonstration Unit. With the completion of its construction in fiscal year 2008, PDU-related R&D expenses going forward are expected to be significantly reduced, as they will be mostly limited to the operations of the PDU. Also included in the increase for the current period were expenses incurred for work on advanced catalysts, catalyst separation from crude wax, process optimization, and product upgrading.

CLASS ACTION COMPLAINT

As of September 30, 2008, Rentech had cash and cash equivalents of $63.7 million on a consolidated basis compared to $33.7 million at September 30, 2007.

Commenting on the fiscal year 2008 financial results, D. Hunt Ramsbottom, President and CEO of Rentech, stated, "We are extremely pleased with REMC's results, as the plant continues to perform exceptionally well. REMC achieved record production volumes and we were able to capture the record prices found in the market." Mr. Ramsbottom continued, "We presently believe our recent corporate cost reductions, in conjunction with the expected continued strong performance of REMC, will enable Rentech to achieve positive consolidated EBITDA for fiscal year 2009. This is a significant milestone as it marks the first time in our Company's history that we have projected positive consolidated EBITDA performance."

Mr. Ramsbottom added, "We are fortunate that we have a profitable operating asset and are able to forecast improved financial results even in this difficult macro-economic environment. We believe that these attributes, in addition to operating the only synthetic transportation fuels facility in the U.S., positions us well within the alternative energy sector." Mr. Ramsbottom continued, "In the short time that we have operated the PDU, we have not only sent samples of our products to potential customers, but through 20% greater catalyst productivity and improved catalyst composition, we have identified opportunities to enhance the economic returns of facilities utilizing the Rentech Process by reducing capital requirements and operating costs."

31.     On the same day, Rentech filed a Form 10K with the SEC for its fiscal 2008 fourth quarter and fiscal year ended September 30, 2008.  This Form 10K was signed by Defendants Ramsbottom, Cohrs, Yakobson, Burke, Ray, Stern, Sega, Washburn, and reaffirmed the Company's financial results announced on the same day.

32.     On February 9, 2009, Rentech issued a press release announcing its results for its fiscal 2009 first quarter.  The press release stated, in relevant part:

CLASS ACTION COMPLAINT

For the first quarter of fiscal year 2009, Rentech reported revenue of $50.1 million, compared to $47.5 million for the comparable quarter in the prior year. Rentech reported a net loss applicable to common shareholders of $4.3 million or $0.03 per share for the quarter ended December 31, 2008, which included a $0.06 per share write-down of inventory to market. This compares to a net loss applicable to common shareholders of $23.4 million or $0.14 per share for the comparable period in fiscal year 2008, which included $0.05 per share of non-cash impairment charges.

Rentech continues to project consolidated EBITDA to be positive in fiscal year 2009 and that the Company's consolidated business plan for fiscal year 2009 can be funded internally by cash generated at its wholly-owned nitrogen fertilizer facility, Rentech Energy Midwest Corporation (REMC). This is a result of Rentech's continued expectation that EBITDA at REMC will be well in excess of $50 million in fiscal year 2009 due to anticipated strong spring pricing and demand for nitrogen fertilizer products in the Midwest as well as the fact that a significant portion of REMC's fiscal year's production has already been presold. The Company's projected consolidated EBITDA also takes into consideration the effect of cost savings implemented at the corporate level and at the Company's Product Demonstration Unit (PDU), as well as the fact that construction of the PDU has been completed. EBITDA is a non-GAAP measure. Further explanation of this non-GAAP measure and a computation of REMC's EBITDA has been included below in this press release.

Revenue for the first quarter of fiscal 2009 was affected by weather and the timing of seasonal fertilizer applications and is not expected to be representative of revenue for the remaining quarters of fiscal 2009. The Company believes that fundamental factors such as forecast corn acreage and pent-up demand for nitrogen fertilizer due to the weather-interrupted fall applications indicate strong demand for nitrogen fertilizer products in the spring 2009 planting season.

Selling, general and administrative (SG&A) expenses were $6.0 million for the first quarter of fiscal year 2009, compared to $8.8 million for the prior year. Research and development (R&D) expenses for the first quarter of fiscal year 2009 were $5.4 million as compared to $16.0 million for the prior year. The decrease was primarily due to the completion of the construction of the PDU in the prior fiscal year. Current period R&D expenses were attributable to costs associated with operating the facility in addition to

expenses incurred for work on advanced catalysts, catalyst separation from crude wax, process optimization, and product upgrading.

As of December 31, 2008 Rentech had cash and cash equivalents of $28.9 million on a consolidated basis.

Commenting on the first quarter results for fiscal year 2009, D. Hunt Ramsbottom, President and CEO of Rentech, stated, "We are pleased to already see the benefits of our recent cost reductions. This quarter, SG&A and R&D expenses declined by over 50% from the same quarter the previous year. With this lower level of spending expected to continue in future quarters as well as strong performance from REMC, we believe that our business plan for fiscal year 2009 may be funded by cash generated at REMC." Mr. Ramsbottom continued, "At a time when most alternative energy companies are in need of liquidity, we are fortunate that we can continue to execute our business plan without the need to access the capital markets."

33. On the same day, Rentech filed a Form 10Q with the SEC for its fiscal 2009 first quarter. This Form 10Q was signed by Defendants Ramsbottom and Cohrs and reaffirmed the Company's financial results announced the same day.

34. On May 12, 2009, Rentech issued a press release announcing its results for its fiscal 2009 second quarter. The press release, which reaffirmed the results from the Company's May 11, 2009 Form 10Q signed by Defendants Ramsbottom and Cohrs, stated, in relevant part:

For the second quarter of fiscal year 2009 ended March 31, Rentech reported a net loss applicable to common shareholders of $16.5 million, or $0.10 per share. The loss included a $0.04 per share write-down of inventories of natural gas due to continued declines in the price of this key input to the Company's fertilizer products. This compares to a net loss applicable to common shareholders of $22.8 million, or $0.14 per share, for the comparable period in fiscal year 2008.

15

1
2
3
4
5
6

Results for the quarter reflected the effect of delayed shipments of fertilizer in the key markets of the Company's wholly-owned nitrogen fertilizer business, Rentech Energy Midwest Corporation (REMC), due to weather conditions which improved significantly during April. Results of operations are typically seasonal due to the planting, growing and harvesting cycles of farmers. The timing of fertilizer applications, and therefore of shipments from REMC, can vary due to weather conditions. Revenue is recognized as products are shipped.

7
8
9
10
11
12
13

The write-down of natural gas inventories reflects the Company's policy of accounting for advanced purchases of gas as inventories. The Company's practice is to purchase gas at fixed prices when fertilizer products are pre-sold at predetermined prices, in order to lock in margins on the pre-sold products. When gas prices decline, as in the first six months of fiscal year 2009, the value of gas contracts is marked to market, leading to the inventory adjustments. In periods after the inventory write-down, as product is delivered, cost of goods sold is recognized at the lower prices to which the gas inventory was written down, which would tend to result in higher margins.

14
15
16
17
18
19
20
21
22

Rentech reported revenue of $16.8 million for the second quarter of fiscal year 2009, down from $28.5 million for the comparable quarter in the prior year. The reduction was due to delays in fertilizer shipments during the second quarter of fiscal 2009, caused by poor spring weather. These shipment delays had the effect of delaying the realization of revenue on significant volumes until April. Improved weather in April led to record shipments, revenue, and profits for REMC in that month. For fiscal year 2009 through April, unaudited revenue was $120.3 million, up from $89.1 million in the comparable period in fiscal 2008, representing a 35% increase. Due to seasonality, the significant pre-sales of fertilizer products and the strong April results, the Company does not expect the weak second quarter results to be indicative of results for the full fiscal year 2009.

23
24
25
26
27

35.    On August 10, 2009, Rentech issued a press release announcing its results for its third quarter of fiscal year 2009. The press release stated, in relevant part:

28

For the third quarter of fiscal year 2009 ended June 30, Rentech reported net income applicable to common shareholders of $36.1 million, or $0.22 per share. This compares to a net loss applicable to common shareholders of $7.8 million, or $0.05 per share, for the comparable period in fiscal year 2008.

Rentech reported revenue of $91.4 million for the third quarter of fiscal year 2009, up from $60.4 million for the comparable quarter in the prior year. The increase resulted from higher product pricing and record shipments during the quarter as favorable weather conditions allowed the realization of revenue on significant volumes shipped. Shipments during the second fiscal quarter had been delayed by bad weather.

Rentech projects that its earnings per share will be positive for fiscal year 2009. Rentech is increasing its consolidated EBITDA guidance for fiscal year 2009 to greater than $25 million compared to previous guidance of $15 million. The Company has also increased fiscal year 2009 EBITDA guidance for its wholly-owned nitrogen fertilizer business, Rentech Energy Midwest Corporation (REMC), to greater than $65 million from previous guidance of $65 million. In addition to the strong results for the quarter, factors that the Company considered in increasing guidance included: significant pre-sales of fertilizer products for the remainder of the fiscal year; natural gas prices that are forecasted to remain at lower than budgeted levels; and demand for nitrogen products driven by continued strong prospects for planted corn acreage. EBITDA is a non-GAAP measure. Further explanation of this non-GAAP measure and a computation of consolidated EBITDA and EBITDA at REMC have been included below in this press release.

36.     On the same day, Rentech filed a Form 10Q with the SEC for its third quarter of fiscal year 2009.  This Form 10Q was signed by Defendants Ramsbottom and Cohrs and reaffirmed the Company's financial results announced on the same day.

37.     The above statements in ¶¶ 24-36 were materially false and misleading because Defendants misrepresented or failed to disclose that: (a) certain

1  deposit payments associated with the Company's forward contracts for natural gas

2
3  purchases were incorrectly reported on Rentech's balance sheets as inventory

4  rather than deposits; (b) as a result, the Company's financial results were

5  overstated during the Class Period; (c) the Company had failed to properly

6
7  recognize deposits on its balance sheets in violation of GAAP; (d) the Company

8  lacked adequate internal and financial controls; and (e) as a result of the above, the

9  Company's financial statements during the Class Period were materially false and

10  misleading at all relevant times.

11

12                    **THE TRUTH COMES TO LIGHT**

13        38.    On December 14, 2009, Rentech filed a Form 8K with the SEC and

14  revealed that the Company had improperly reported certain deposit payments as

15  inventory.  As the 8K stated in relevant part:

16

17
18        On December 12, 2009, the Audit Committee of the Board of Directors of
      the Company concluded that the Company's consolidated financial
19        statements for the fiscal year ended September 30, 2008 and for the quarters
      ended June 30, 2009, March 31, 2009, December 31, 2008, September 30,
20        2008, June 30, 2008, March 31, 2008 and December 31, 2007 should no
      longer be relied upon for the reasons described below.
21

22        On December 14, 2009, the Company is filing its annual report on Form 10-
      K for the fiscal year ended September 30, 2009, which includes re-stated
23        financial statements for the periods described above. These restatements
24        reported in the Form 10-K are due to a correction in the accounting treatment
      of forward gas purchase contracts and inventory valuation as described
25        further herein.

26        The Company enters into forward contracts with fixed delivery prices to
27        purchase portions of the natural gas required to produce fertilizer for the
      Company's nitrogen fertilizer business. Some of the forward contracts
28

                                    18

require the Company to pay a deposit for the natural gas at the time of contract signing, and all of the contracts require deposits in the event that the market price for natural gas falls after the date of the contract to a price below the fixed price in the contracts.

The Company previously recorded these deposits incorrectly as inventory and performed a lower of cost or market ("LCM") analysis on this component of inventory on a monthly basis. In certain periods, the LCM analysis resulted in impairments of the component of inventory represented by the gas contract deposits, and those impairments were recognized in cost of goods sold as write-downs of inventory in those periods. As product produced from the gas associated with the impaired deposits was shipped in periods after the write-downs, the cost of gas recognized in cost of goods sold at the time of sale was lower than the cost that would have been calculated using the contracted prices, in an amount equal to the previous inventory write-downs. This prior treatment affected the timing, but not the total amount, of expense recognized in conjunction with gas purchased under forward contracts. The correction in accounting treatment had no effect on cash flows.

The Company has now determined that these deposits should have been classified on the balance sheet as deposits, rather than as inventory, because neither title nor risk of loss passed to the Company when it paid the deposits for the natural gas. The Company has also determined that the LCM adjustments related to these contract deposits were not calculated in a manner consistent with generally accepted accounting principles. In future periods, the cost of natural gas purchased under forward contracts will be recognized at contracted prices as the gas flows through production, into finished goods inventory, and then into cost of goods sold as the product is shipped, or directly into cost of goods sold in the case of a sale of the gas. The LCM analysis will be performed by examining the projected margin on the sale of finished goods, not by examining the market price relative to the contract price for the natural gas component of inventory.

On December 14, 2009, the Company is filing its Annual Report on Form 10-K for the fiscal year ended September 30, 2009. In the Form 10-K, the Company has restated its consolidated balance sheet at September 30, 2008, and the consolidated statements of operations, changes in stockholders' equity (deficit), and comprehensive loss for the fiscal year ended September 30, 2008. The Form 10-K also presents restated selected quarterly financial data for the quarters ended June 30, 2009, March 31, 2009, December 31, 2008, September 30, 2008, June 30, 2008, March 31, 2008

19

and December 31, 2007. The restatements correct the errors described above by reclassifying amounts from inventory to deposits, and reversing the effects of the LCM adjustments in the statements of operations, changes in stockholders' equity (deficit), and comprehensive loss. These corrections materially change the timing, but not the total amount, of the recognition of expenses for purchases of natural gas. In periods in which inventory impairments are being reversed, the cost of gas recognized will be lower than under the previous treatment. In periods following inventory impairments, the cost of goods sold will now be higher than the cost recognized under the previous treatment.

Management has assessed the effect of the restatement on the Company's internal control over financial reporting and its disclosure controls and procedures and has reflected its conclusions regarding these matters under Item 9A in the Company's Annual Report on Form 10-K for the fiscal year ended September 30, 2009.

39.    On the same day, the Company issued its Form 10K for its fiscal 2009 fourth quarter and fiscal year ended September 30, 2009 (12/14/09 Form 10K), which revealed further detail regarding the improper accounting in Rentech's previously issued financial statements.  As the 12/14/09 Form 10K stated, in relevant part:

The Company has restated its consolidated balance sheet at September 30, 2008, and the consolidated statements of operations, changes in stockholders' equity (deficit), and comprehensive loss for the fiscal year ended September 30, 2008, to correct these errors by reclassifying the deposits from inventory to deposits on gas contracts, and to reverse the effects of the LCM adjustments in the statements of operations, changes in stockholders' equity (deficit), and comprehensive loss. These corrections materially change the timing, but not the total amount, of the recognition of expenses for purchases of natural gas. In periods in which inventory impairments are being reversed, the cost of gas recognized will be lower than under the previous treatment. In periods following inventory impairments, the cost of goods sold will now be higher than the cost recognized under the previous treatment. In fiscal year 2008, the cost of goods sold is now reported as approximately $6.0 million less than the

20

CLASS ACTION COMPLAINT

amount previously reported. Results of operations reported herein for fiscal year 2009 would have been materially different had the prior treatment of forward natural gas contracts and of inventory impairment been applied (see Note 21 for a discussion of the restatement's impact on the three quarterly periods of fiscal year 2009 previously reported).

The following table presents the effects of the restatement adjustments on the Company's previously reported consolidated statement of operations for the years ended September 30, 2008 (in thousands, except per share data):

| | As Previously Reported | Restatement Adjustments | As Restated |
|---|---|---|---|
| Total cost of sales | $ 160,425 | $ (6,005) | $ 154,420 |
| Gross profit | 50,546 | 6,005 | 56,551 |
| Write down of inventory to market | 8,650 | (8,650) | 0 |
| Loss from continuing operations before income taxes | (62,965) | 6,005 | (56,960) |
| Net loss | (62,887) | 6,005 | (56,882) |
| EPS — Basic | (0.38) | 0.04 | (0.34) |
| EPS — Diluted | (0.38) | 0.04 | (0.34) |

The following table presents the effect of the restatement on the Company's consolidated balance sheet as of September 30, 2008 (in thousands):

| | As Previously Reported | Restatement Adjustments | As Restated |
|---|---|---|---|
| Inventories | $ 29,491 | $ (12,362) | $ 17,129 |
| Deposits on gas contracts | — | 18,368 | 18,368 |
| Accumulated deficit | (255,260) | 6,005 | (249,255) |
| Total stockholders' deficit | (13,089) | 6,005 | (7,084) |

40.    The 12/14/09 Form 10K also revealed the significant effect the Company's improper accounting would have on the previously issued financial statements for the quarters ended June 30, 2009, March 31, 2009, December 31, 2008, September 30, 2008, June 30, 2008, March 31, 2008 and December 31, 2007. The 12/14/09 Form 10K contained the following table, which indicated the

effect this improper accounting would have on the Company's 2008 and 2009

balance sheets (in thousands, except per share data):

| | Gross Profit (Loss) | Operating Income (Loss) | Income (Loss) from Continuing Operations | Net Income (Loss) | Basic Income (Loss) per Share | Diluted Income (Loss) per Share |
|---|---|---|---|---|---|---|
| **Quarter ended June 30, 2009** | | | | | | |
| As previously reported | $ 52,567 | $ 39,026 | $ 36,130 | $ 36,132 | $ 0.22 | $ 0.22 |
| Restatement adjustments | (1,819) | (1,819) | (1,819) | (1,819) | (0.01) | (0.02) |
| As restated | $ 50,748 | $ 37,207 | $ 34,311 | $ 34,313 | $ 0.21 | $ 0.20 |
| **Quarter ended March 31, 2009** | | | | | | |
| As previously reported | $ (3,004) | $ (13,946) | $ (16,592) | $ (16,539) | $ (0.10) | $ (0.10) |
| Restatement adjustments | (8,131) | (8,131) | (8,131) | (8,131) | (0.05) | (0.05) |
| As restated | $ (11,135) | $ (22,077) | $ (24,723) | $ (24,670) | $ (0.15) | $ (0.15) |
| **Quarter ended December 31, 2008** | | | | | | |
| As previously reported | $ 9,661 | $ (2,099) | $ (4,334) | $ (4,323) | $ (0.03) | $ (0.03) |
| Restatement adjustments | 4,061 | 4,061 | 4,061 | 4,061 | 0.03 | 0.03 |
| As restated | $ 13,722 | $ 1,962 | $ (273) | $ (262) | $ 0.00 | $ 0.00 |
| **Quarter ended September 30, 2008** | | | | | | |
| As previously reported | $ 14,784 | $ (3,593) | $ (8,935) | $ (8,905) | $ (0.05) | $ (0.05) |
| Restatement adjustments | 6,005 | 6,005 | 6,005 | 6,005 | 0.04 | 0.04 |
| As restated | $ 20,789 | $ 2,412 | $ (2,930) | $ (2,900) | $ (0.01) | $ (0.01) |
| **Quarter ended June 30, 2008** | | | | | | |
| As previously reported | $ 17,567 | $ (6,977) | $ (7,794) | $ (7,772) | $ (0.05) | $ (0.05) |
| Restatement adjustments | — | — | — | — | — | — |
| As restated | $ 17,567 | $ (6,977) | $ (7,794) | $ (7,772) | $ (0.05) | $ (0.05) |

22

CLASS ACTION COMPLAINT

| | | | | | |
|---|---|---|---|---|---|
| **Quarter ended March 31, 2008** | | | | | |
| As previously reported | $   7,917 | $   (22,480) | $   (22,812) | $   (22,796) | $   (0.14)    $   (0.14) |
| Restatement adjustments | (82) | (82) | (82) | (82) | —         — |
| As restated | $   7,835 | $   (22,562) | $   (22,894) | $   (22,878) | $   (0.14)    $   (0.14) |
| **Quarter ended December 3 1, 2007** | | | | | |
| As previously reported | $   10,278 | $   (23,427) | $   (23,437) | $   (23,414) | $   (0.14)    $   (0.14) |
| Restatement adjustments | 82 | 82 | 82 | 82 | —         — |
| As restated | $   10,360 | $   (23,345) | $   (23,355) | $   (23,332) | $   (0.14)    $   (0.14) |

41.    Indeed, the Company even revealed in the Form 10K that it had failed to maintain adequate internal and financial controls during the Class Period. As the Form 10K stated in relevant part:

> The Company did not maintain effective controls over the selection and application of GAAP. Specifically, the members of the Company's management with the requisite level of accounting knowledge, experience and training commensurate with the Company's financial reporting requirements did not analyze certain accounting issues at the level of detail required to ensure the proper application of GAAP in certain circumstances. This material weakness resulted in a restatement of the Company's financial statements for fiscal year 2008 and each of the first three interim periods during fiscal year 2009 related to the appropriate accounting for the valuation of the Company's natural gas inventory. The restatement resulted in a decrease of cost of goods sold of approximately $6 million, a decrease in inventory of approximately $12 million and an increase of deposits on gas contracts of approximately $18 million for the fiscal year ended September 30, 2008. This material weakness also resulted in the identification of additional audit adjustments that have been reflected in the Company's 2009 financial statements. Additionally, this material weakness could result in misstatements of the Company's account balances or disclosures that would result in a material misstatement to the Company's

CLASS ACTION COMPLAINT

1    annual or interim consolidated financial statements that would not be
2    prevented or detected.

3    42.    On December 15, 2009, the Company filed a Form 8K attaching a
4    press release Rentech issued on December 14, 2009 revealing the effect of the
5    restatement.  As the Form 8K stated in relevant part:
6

7    The restatements had the effect of increasing operating earnings and
8    EBITDA in fiscal 2008 by approximately $6 million, and caused a reduction
     in reported operating earnings and EBITDA in fiscal 2009 of approximately
9    $6 million due to changes in the timing of expense recognition. The
     guidance that the Company had previously provided regarding expected full
10   year fiscal 2009 results did not give effect to this accounting change or the
11   related downward adjustment in reported fiscal 2009 results caused by the
     restatement.
12

13   43.    On December 15, 2009, after Rentech fully revealed the Company's
14   previous financial statements could not be relied upon, trading in Rentech stock
15
     was extraordinarily heavy, with an increased trading volume of 195% compared to
16
17   the average trading volume of the previous week.  Rentech shares would
18   eventually fall to a low of $1.27 a share on December 18, 2009, representing a
19
20   25% drop from the stock's opening price on December 14, 2009 (when the
21   restatement was announced), and a 46% drop from the stock's high trading price
22   during the Class Period of $2.36 on August 29, 2008.
23
24            **DEFENDANTS' FAILURES TO DISCLOSE THE TRUTH**
25   44.    Rentech's statements and filings during the Class Period were
26   materially false and misleading because they misrepresented or failed to disclose
27
28   that: (a) certain deposit payments associated with the Company's forward contracts

for natural gas purchases were incorrectly reported on Rentech's balance sheets as inventory rather than deposits; (b) as a result, the Company's financial results were overstated during the Class Period; (c) the Company had failed to properly recognize deposits on its balance sheets in violation of GAAP; (d) the Company lacked adequate internal and financial controls; and (e) as a result of the above, the Company's financial statements during the Class Period were materially false and misleading at all relevant times.

45.    The market for Rentech securities was an open, well-developed and efficient market at all relevant times. As a result of the materially false and misleading statements and failures to disclose described herein, Rentech securities traded at artificially inflated prices during the Class Period. Plaintiff and the other members of the Class purchased or otherwise acquired Rentech securities relying upon the integrity of the market price of Rentech securities and market information related to Rentech, and have been damaged thereby.

46.    During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Rentech securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading. Such statements and omissions were materially false and misleading in that they failed to disclose material adverse nonpublic information and misrepresented the truth about the Company, its business and operations, as alleged herein.

CLASS ACTION COMPLAINT

47.    At all relevant times, the material misrepresentations and omissions particularized herein directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and the other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and misleading statements about Rentech's business, prospects and operations.

48.    These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Rentech and its business, prospects and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

49.    As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company during the Class Period were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

CLASS ACTION COMPLAINT

50.     As set forth herein, Defendants, by virtue of their receipt of information reflecting the true facts regarding Rentech, their control over, receipt and/or modification of Rentech's allegedly materially misleading statements and omissions, and/or their positions with the Company which made them privy to confidential information concerning Rentech, participated in the fraudulent scheme alleged herein.

51.     The ongoing fraudulent scheme described in this complaint could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and complicity of the personnel at the highest level of the Company, including the Individual Defendants.

## CLASS ACTION ALLEGATIONS

52.     Plaintiff brings this action as a class action under Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of a class of persons and entities who purchased shares of Rentech during the Class Period.  Excluded from the class are Defendants herein, officers and directors of the Company, members of their immediate families and their legal representatives, and the heirs, successors or assigns of any of the foregoing.

53.     The Class is so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, millions of Rentech shares

were traded publicly during the Class Period on AMEX and as of July 31, 2009, Rentech had 192,918,180 shares of common stock outstanding.

54.    Plaintiff will fairly and adequately protect the interests of the members of the Class.  Plaintiff has no interests which are contrary to, or in conflict with, the interests of the Class members that he seeks to represent.  Plaintiff has retained competent counsel, experienced in class action litigation under the federal securities laws to ensure such protection, and intends to prosecute this action vigorously.

55.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impossible for the members of the Class to individually seek redress for the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

56.    Questions of law and fact common to the members of the Class predominate over any questions that may affect only individual members in that Defendants have acted on grounds generally applicable to the entire Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether Defendants' publicly disseminated releases and statements during the Class Period, omitted and/or misrepresented material facts, and whether Defendants breached any duty to convey material facts or to correct material facts previously disseminated;

- whether Defendants participated in and pursued the common course of conduct complained of herein;

- whether Defendants acted with scienter in omitting and/or misrepresenting material facts;

- whether the market price of the Company's publicly traded securities was artificially inflated during the Class Period due to the non-disclosures and/or material misrepresentations complained of herein; and

- whether the Class members have suffered damages and, if so, what is the proper measure of damages.

57.    Plaintiff's claims are typical of the claims of the members of the Class as Plaintiff and members of the Class sustained damages arising out of Defendants' wrongful conduct in violation of federal law as complained of herein.

## SCIENTER ALLEGATIONS

58.    As alleged herein, Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly

and substantially participated or acquiesced in the issuance of dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein, defendants, by virtue of their receipt of information reflecting the true facts regarding Rentech, their control over, and/or receipt and/or modification of, Rentech's materially misleading misstatements and omissions and/or their associations with the Company which made them privy to confidential proprietary information concerning Rentech, participated in the fraudulent scheme alleged herein.

59.   The Individual Defendants were motivated to commit the fraudulent scheme in order to reap significant personal profits.  A number of the Individual Defendants sold substantial amounts of their shareholdings during the Class Period, while the Company's accounting issues were concealed and Rentech's earnings were inflated, as evidenced in the following table:

| **Date** | **Director/Officer** | **Shares Sold** | **Price Per Share** | **Proceeds** |
|---|---|---|---|---|
| 10 Mar 2008 | YAKOBSON | 30,000 | $1.03 | $30,900 |
| 14 May 2008 | KERR | 39,366 | $1.39 | $54,719 |
| 9 Jul 2008 | YAKOBSON | 21,000 | $1.48 | $31,080 |
| 8 Sep 2008 | YAKOBSON | 31,000 | $1.93 | $59,830 |
| 9 Sep 2008 | YAKOBSON | 18,000 | $1.83 | $32,940 |
| 10 Nov 2008 | YAKOBSON | 20,000 | $0.69 | $13,800 |
| 10 Nov 2008 | YAKOBSON | 17,000 | $0.68 | $11,560 |
| 10 Nov 2008 | YAKOBSON | 10,000 | $0.67 | $6,700 |
| 10 Nov 2008 | YAKOBSON | 3,000 | $0.70 | $2,100 |
| 14 Dec 2008 | RAMSBOTTOM | 35,786 | $0.64 | $22,903 |
| 11 Jan 2009 | YAKOBSON | 40,000 | $0.80 | $32,000 |
| 14 Jan 2009 | PENNING | 19,732 | $0.68 | $13,418 |
| 19 Jan 2009 | MILLER | 59,892 | $0.70 | $41,924 |

CLASS ACTION COMPLAINT

| 9 Mar 2009 | YAKOBSON | 20,000 | $0.56 | $11,200 |
| 9 Mar 2009 | YAKOBSON | 20,000 | $0.56 | $11,200 |
| 9 Mar 2009 | YAKOBSON | 20,000 | $0.56 | $11,200 |
| 10 May 2009 | YAKOBSON | 46,000 | $0.70 | $32,200 |
| 21 Oct 2009 | COHRS | 38,729 | $1.60 | $61,966 |

Source:http://www.reuters.com/finance/stocks/insiderTrading?symbol=RTK&name=&pn=1&sortDir=ASC&sortBy=d

60.     Each of these Defendants sold his stock while in possession of material adverse non-public information concerning Rentech, namely, the Company's improper accounting that inflated the price of Rentech stock. Accordingly, the facts alleged herein compel a strong inference, that is cogent and at least as compelling as any opposing inference of nonfraudulent intent, that Defendants made materially false and misleading statements to the investing public with scienter.

## NO SAFE HARBOR

61.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint.  Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements

31

1   pleaded herein, Defendants are liable for those false forward-looking statements

2   because at the time each of those forward-looking statements was made, the

3

4   particular speaker knew that the particular forward-looking statement was false,

5   and/or the forward-looking statement was authorized and/or approved by an

6   executive officer of Rentech who knew that those statements were false when

7

8   made.

9                              **LOSS CAUSATION**

10

11      62.    Defendants' wrongful conduct, as alleged herein, directly and

12   proximately caused the economic loss suffered by Plaintiff and the Class.

13      63.    During the Class Period, Plaintiff and the Class purchased Rentech

14

15   securities at artificially inflated prices and were damaged thereby.  The price of

16   Rentech securities significantly declined when the misrepresentations made it to

17   the market, and/or the information alleged herein to have been concealed from the

18

19   market, and/or the effects thereof, were revealed, causing investors' losses.

20                         **RELIANCE ALLEGATIONS**
                        **FRAUD ON THE MARKET DOCTRINE**
21

22      64.    At all relevant times, the market for Rentech securities was on an

23   efficient market for the following reasons, among others:

24

25          i.    At all relevant times during the Class Period, shares of Rentech

26              were listed and actively traded on AMEX, a highly efficient national

27              market exchange.

28

                                     32

ii.     As a registered and regulated issuer of securities, Rentech filed periodic reports with the SEC, in addition to the frequent voluntary dissemination of information described in this complaint.

iii.     Numerous financial analysts followed the Company's stock. Thus, the Company's stock reflected the effect of information disseminated in the market.

65.     As a result of the above, the market for Rentech securities promptly digested current information with respect to the Company from all publicly available sources and reflected such information in the securities' prices.  Under these circumstances, all purchasers of Rentech securities during the Class Period suffered similar injury through their purchase of securities at prices which were artificially inflated by defendants' misrepresentations and omissions.  Thus, a presumption of reliance applies.

## **CLAIMS FOR RELIEF**

## **COUNT I**

**VIOLATIONS OF SECTION 10(B) OF THE EXCHANGE ACT AND RULE 10B-5 PROMULGATED THEREUNDER AGAINST ALL DEFENDANTS**

66.     Plaintiff incorporates by reference and realleges all preceding paragraphs as though fully set forth herein.

67.     During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were

misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstance under which they were made, not misleading.

68.    Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

      i.    employed devices, schemes and artifices to defraud;

      ii.    made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

      iii.    engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of shares in Rentech during the Class Period.

69.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for shares of Rentech. Plaintiff and the Class would not have purchased Rentech at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

70.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Rentech securities during the Class Period.

## COUNT II

## VIOLATIONS OF SECTION 20(A) OF THE EXCHANGE ACT AGAINST THE INDIVIDUAL DEFENDANTS

71.     Plaintiff incorporates by reference and realleges all preceding paragraphs as though fully set forth herein.

72.     During the Class Period, the Individual Defendants acted as controlling persons of Rentech within the meaning of Section 20(a) of the Exchange Act.  By reason of their positions with the Company, their business expertise, their participation and/or awareness of the Company's operations, and their ownership of Rentech securities, the Individual Defendants had the power and authority to cause Rentech to engage in the wrongful conduct complained of herein.  By reason of such conduct, the Individual Defendants and Rentech are liable pursuant to §20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.     Declaring this action to be a proper class action, certifying Plaintiff as a Class representative pursuant to Fed. R. Civ. P. 23, and certifying his counsel as Class counsel;

B.     Awarding Plaintiff and the members of the Class damages, interest and costs;

C.     Awarding Plaintiff reasonable costs and attorneys' fees; and

1        D.     Awarding such equitable/injunctive or other relief as the Court may

2 deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated:  December 29, 2009             Respectfully submitted,

Mark Punzalan

Rosemary M. Rivas
**FINKELSTEIN THOMPSON LLP**
100 Bush St., Suite 1450
San Francisco, California 94104
Telephone:  (415) 398-8700
Facsimile:  (415) 398-8704

*Of Counsel*
Donald J. Enright
Elizabeth K. Tripodi
**FINKELSTEIN THOMPSON LLP**
The Duval Foundry
1050 30th Street, NW
Washington, D.C. 20007
Telephone:  (202) 337-8000
Facsimile:  (202) 337-8090

CLASS ACTION COMPLAINT

## PLAINTIFF CERTIFICATION

I, Michael Silbergleid, hereby declare that:

1.     I have reviewed a draft Complaint in this class action and have authorized the filing thereof.

2.     I did not purchase (or otherwise acquire) or sell securities of Rentech, Inc., the subject of the Complaint, at the direction of counsel or in the hope to participate in any private action arising under the Securities Act of 1933 or the Securities Exchange Act of 1934.

3.     I am willing to serve as a representative plaintiff on behalf of the class defined in the Complaint, including providing testimony at deposition and trial, if necessary.

4.     I have engaged in the following transactions involving the securities of Rentech, Inc:

| Purchases | Trade Date | Price Per Security | Total |
|---|---|---|---|
| 100 shares | Sept 5, 2008 | 2.00 | 200.00 + 12.95 commission |

| Sales | Date | Price Per Security | Total |
|---|---|---|---|
| | | | |

5.     During the last three years preceding the date of this Certification, I have sought to serve as a representative plaintiff on behalf of a class in the following actions brought under the Securities Act of 1933 or the Securities Exchange Act of 1934:

6.      I will not accept any payment for serving as a representative plaintiff on behalf of the class beyond its pro rata share of any recovery, except as ordered by the Court.

7.      Nothing herein shall be construed to be or constitute a waiver of my attorney-client privilege.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on the _26_ day of _December_, 2009.


_____
Michael Silbergleid

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

**NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY**

This case has been assigned to District Judge George King and the assigned discovery Magistrate Judge is Patrick J. Walsh.

The case number on all documents filed with the Court should read as follows:

## CV09- 9495 GHK (PJWx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

==================================================

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| [X] **Western Division** | [ ] **Southern Division** | [ ] **Eastern Division** |
|---|---|---|
| 312 N. Spring St., Rm. G-8 | 411 West Fourth St., Rm. 1-053 | 3470 Twelfth St., Rm. 134 |
| Los Angeles, CA 90012 | Santa Ana, CA 92701-4516 | Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

CV-18 (03/06)      NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

Rosemary M. Rivas (State Bar No. 209147)

Mark Punzalan (State Bar No. 247599)

FINKELSTEIN THOMPSON LLP

100 Bush Street, Suite 1450

San Francisco, CA 94104

Telephone: (415) 398-8700

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL SILBERGLEID on behalf of himself and all others similarly situated<br><br>PLAINTIFF(S)<br>v.<br><br>RENTECH, INC.; D. HUNT RAMSBOTTOM; MERRICK KERR; DOUGLAS M. MILLER; DAN J. COHRS; DENNIS L. YAKOBSON; MICHAEL S. BURKE; MICHAEL F. RAY; EDWARD M. STERN; RONALD M. SEGA; HALBERT S. WASHBURN; RICHARD T. PENNING    DEFENDANT(S). | CASE NUMBER<br><br>CV09-9495 GHK PJWx<br><br>SUMMONS |

TO:    DEFENDANT(S): RENTECH, INC.; D. HUNT RAMSBOTTOM; MERRICK KERR; DOUGLAS M. MILLER; DAN J. COHRS; DENNIS L. YAKOBSON; MICHAEL S. BURKE; MICHAEL F. RAY; EDWARD M. STERN; RONALD M. SEGA; HALBERT S. WASHBURN; RICHARD T. PENNING

A lawsuit has been filed against you.

Within ___21___ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff's attorney, Finkelstein Thompson LLP _____, whose address is 100 Bush Street, Suite 1450, San Francisco, CA 94104 _____. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated: __2 9 DEC 2009__

By: ____SHEA BOURGEOIS____

Deputy Clerk

(Seal of the Court)

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed 60 days by Rule 12(a)(3)].*

CV-01A (12/07)                                    SUMMONS

COPY

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

| I (a) PLAINTIFFS (Check box if you are representing yourself ☐) | DEFENDANTS |
|---|---|
| MICHAEL SILBERGLEID | See Attachment A. |

| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.) | Attorneys (If Known) |
|---|---|
| Rosemary Rivas; Mark Punzalan; Finkelstein Thompson LLP<br>100 Bush St., Suite 1450<br>San Francisco, CA 94104 | |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff    ☒ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant    ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☒ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1 Original Proceeding    ☐ 2 Removed from State Court    ☐ 3 Remanded from Appellate Court    ☐ 4 Reinstated or Reopened    ☐ 5 Transferred from another district (specify):    ☐ 6 Multi-District Litigation    ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT:   JURY DEMAND:** ☒ Yes   ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☒ Yes   ☐ No          ☐ **MONEY DEMANDED IN COMPLAINT: $**_____

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
15 U.S.C. §§ 78j(b)

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 530 General | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 535 Death Penalty | |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | BANKRUPTCY | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | ☐ 151 Medicare Act | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 490 Cable/Sat TV | | ☐ 355 Motor Vehicle Product Liability | CIVIL RIGHTS | FORFEITURE / PENALTY | PROPERTY RIGHTS |
| ☐ 810 Selective Service | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☒ 850 Securities/Commodities/ Exchange | ☐ 160 Stockholders' Suits | ☐ 362 Personal Injury- Med Malpractice | ☐ 442 Employment | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 190 Other Contract | ☐ 365 Personal Injury- Product Liability | ☐ 443 Housing/Acco- mmodations | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 890 Other Statutory Actions | ☐ 195 Contract Product Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | | SOCIAL SECURITY |
| ☐ 891 Agricultural Act | ☐ 196 Franchise | | ☐ 445 American with Disabilities - Employment | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 892 Economic Stabilization Act | REAL PROPERTY | IMMIGRATION | ☐ 446 American with Disabilities - Other | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 893 Environmental Matters | ☐ 210 Land Condemnation | ☐ 462 Naturalization Application | ☐ 440 Other Civil Rights | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 894 Energy Allocation Act | ☐ 220 Foreclosure | ☐ 463 Habeas Corpus- Alien Detainee | | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 895 Freedom of Info. Act | ☐ 230 Rent Lease & Ejectment | ☐ 465 Other Immigration Actions | | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 900 Appeal of Fee Determi- nation Under Equal Access to Justice | ☐ 240 Torts to Land | | | | FEDERAL TAX SUITS |
| ☐ 950 Constitutionality of State Statutes | ☐ 245 Tort Product Liability | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| | ☐ 290 All Other Real Property | | | | ☐ 871 IRS-Third Party 26 USC 7609 |

FOR OFFICE USE ONLY:    Case Number: _____

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

CV-71 (05/08)                    CIVIL COVER SHEET                    Page 1 of 2

CV09-9495

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

VIII(a).  IDENTICAL CASES: Has this action been previously filed in this court and dismissed, remanded or closed?  ☑ No   ☐ Yes
If yes, list case number(s): _____

VIII(b).  RELATED CASES: Have any cases been previously filed in this court that are related to the present case?  ☑ No   ☐ Yes
If yes, list case number(s): _____

Civil cases are deemed related if a previously filed case and the present case:

(Check all boxes that apply)   ☐ A.  Arise from the same or closely related transactions, happenings, or events; or
                               ☐ B.  Call for determination of the same or substantially related or similar questions of law and fact; or
                               ☐ C.  For other reasons would entail substantial duplication of labor if heard by different judges; or
                               ☐ D.  Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

IX. VENUE:  (When completing the following information, use an additional sheet if necessary.)

(a)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named plaintiff resides.
☐   Check here if the government, its agencies or employees is a named plaintiff.  If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
|  | Nevada |

(b)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named defendant resides.
☐   Check here if the government, its agencies or employees is a named defendant.  If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles County |  |

(c)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH claim arose.
     **Note:  In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles County |  |

* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties
Note: In land condemnation cases, use the location of the tract of land involved

X. SIGNATURE OF ATTORNEY (OR PRO PER):   _Mark_____   Date   12/29/09

Notice to Counsel/Parties:  The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |

## ATTACHMENT A

DEFENDANTS

RENTECH, INC.; D. HUNT RAMSBOTTOM; MERRICK KERR;
DOUGLAS M. MILLER; DAN J. COHRS; DENNIS L. YAKOBSON;
MICHAEL S. BURKE; MICHAEL F. RAY; EDWARD M. STERN;
RONALD M. SEGA; HALBERT S. WASHBURN; RICHARD T.
PENNING